UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 1:25-cv-20281-EA

BRIAN FORSYTHE,

       Plaintiff,

vs.

NCL (Bahamas) Ltd.,

       Defendant.

_____/

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW

COMES NOW Defendant, NCL (Bahamas) Ltd., by and through its undersigned counsel, pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the Local Rules of the U.S. District Court, Southern District, hereby files this Motion for Summary Judgment, and in support thereof states as follows:

### SUMMARY OF ARGUMENT

This matter involves a lawsuit brought by the Plaintiff, BRIAN FORSYTHE (hereinafter "Plaintiff"), against the Defendant, NCL (Bahamas) Ltd., (hereinafter "NCL" or "Defendant"), for alleged false imprisonment, intentional infliction of emotional distress (IIED), overservice of alcohol, and negligence against the Plaintiff which occurred in the evening late hours of January 24, 2024 [*See* Plaintiff's Amended Complaint [ECF No. 8]]. Plaintiff, a passenger on the Norwegian *Prima* was involved in a physical altercation with another passenger, Blaine Krimmel in the Prima Lounge nightclub.

By way of background, Plaintiff and Mr. Krimmel had an initially friendly interaction, and they had previously spoken during the cruise. However, at nearly 1:00am on January 24, 2024, Mr. Krimmel accused Plaintiff of inappropriately touching Mr. Krimmel's girlfriend, who was sitting next to Plaintiff. Video depicts Mr. Krimmel approaching and standing over Plaintiff, who then stands up and appears to taunt Mr. Krimmel based on Plaintiff's body language. As soon as Plaintiff stands up, two NCL security personnel, Ms. Amrita Gurung and Mr. Amrit Gurung, approached the men while they were still in the booth next to the dancefloor. NCL security positioned themselves between the two men and attempted to separate them. Mr. Krimmel lunged at Plaintiff and appeared to strike him. NCL security then focused entirely on restraining Mr. Krimmel while directing Plaintiff to leave. NCL security personnel also called for backup to assist. While Plaintiff left the booth and took a few steps, he then stopped, appearing to continue mocking Mr. Krimmel while NCL security personnel were attempting to restrain him. Mr. Krimmel, who is a large man, then broke free of NCL security personnel and jumped over a railing to run toward Plaintiff. NCL security personnel chased after Mr. Krimmel and continued their attempts to restrain him while Plaintiff stayed near him. Within approximately 30 seconds of being called, two additional NCL security personnel arrived on scene with one guard, Philomena D Souza, attempting to restrain Mr. Krimmel while another guard, Fnu Manoj Malayil, was attempting to convince Plaintiff to leave the Prima Lounge. [*See* **Exhibit "B"** from 12:58:26am to 12:59:56am]. Mr. Krimmel broke free from NCL security again, and he charged the Plaintiff, who then struck Mr. Krimmel. NCL security guards D Souza and Malayil then escorted Plaintiff out of the Prima Lounge, and he was taken to another floor near a Starbucks for approximately five minutes.

NCL security guard Mr. Rupchandani then arrived near the Starbucks followed later by Security Officer Anthony Horrigan, head of security on the vessel. Mr. Horrigan, Mr. Fnu and Mr.

Rupchandani then escorted Plaintiff to a security office where he remained for approximately 15 minutes, despite Plaintiff claiming this lasted several hours. [*See* **Exhibit "J,"** Deposition of the Plaintiff, Brian Forsythe, at 116:20-23]. Mr. Fnu and Mr. Rupchandani (without Mr. Horrigan) then escorted Plaintiff to a restaurant where he provided his statement of how the subject incident occurred. Plaintiff described the security member who took him to the restaurant as the "de-escalating officer." [*Id.* at 124:3-9]. While in the restaurant, Plaintiff was free to walk around, was given an ice pack, and was free to leave. This was proven when was met with no resistance when he wanted to leave. [*See* **Exhibit "I,"** Camera 6064, from 1:24:45am to 2:40:12am; and **Exhibit "J"** from 126:20 to 127:4].].

NCL is entitled to summary judgment as to all of Plaintiff's claims.  As to Count I of strict liability for false imprisonment, as NCL never improperly detained Plaintiff after NCL security personnel witnessed the physical altercation and acted to prevent imminent threat to public security. [*See* **Exhibit "B,"** Camera 6015 and **Exhibit "C,"** Camera 6014, from 12:59:04am to 12:59:43am]. Further, Plaintiff was simply requested to give a statement as to his version of events, which he willingly provided. As to Count II of strict liability for intentional infliction of emotional distress, the Plaintiff claims that while interacting with Mr. Horrigan, he faced "derogatory" comments including "boy" and "you people." [*See* **Exhibit "J,"** at 134:5-9]. Further, the alleged use of derogatory statements and conduct of NCL's security personnel does not rise to the high level of "extreme and outrageous" as required for a claim of IIED. Likewise, Plaintiff has not demonstrated suffering "severe emotional distress" as required to recover under the theory of IIED.

Plaintiff's claims of overservice of alcohol to Mr. Krimmel fail, as there is no evidence that he was provided with alcohol by NCL while he appeared obviously intoxicated. Finally, Plaintiff's negligence against NCL fail, as there is no evidence that NCL's security staff was not appropriately

trained to handle these situations or that they negligently failed in their response. As such, Plaintiff's claims of false imprisonment, IIED, overservice of alcohol, and negligence are without sufficient basis. Therefore, summary judgement for the Defendant is warranted.

## MEMORANDUM OF LAW

### I.  Legal Standard Governing Motions for Summary Judgment

Summary judgment is appropriate when the pleadings, depositions, affidavits, and exhibits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c); *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). An issue of fact is "material" if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. *Allen v. Tyson Foods, Inc*., 121 F.3d 642, 646 (11th Cir. 1997). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Id*. However, if the nonmoving party's evidence and arguments are merely colorable and raise only some doubt, summary judgment may be granted in favor of the moving party. *See Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

"[O]nce the moving party has met its burden of showing a basis for the motion, the nonmoving party is required to 'go beyond the pleadings' and present competent evidence designating 'specific facts showing that there is a genuine issue for trial.'" *United States v. $183,791.00 in U.S. currency*, 391 Fed. Appx 791, 794 (11th Cir. 2010) (quoting *Celotex*, 477 U.S. at 324 (1986)). Thus, the nonmoving party "may not rest upon the mere allegations or denials of his pleadings, but [instead] must set forth specific facts showing that there is a genuine issue for

trial." *See Anderson*, 477 U.S. at 248 (citation omitted). "Likewise, a [nonmovant] cannot defeat summary judgment by relying upon conclusory assertions." *Maddox-Jones v. Bd. of Regents of Univ. System of Ga.*, 448 Fed. Appx 17, 19 (11th Cir. 2011). Mere "metaphysical doubt as to the material facts" will not suffice. *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 586.

In the Eleventh Circuit, video evidence prevails over contradictory testimony. *Cunningham v. Cobb County, Georgia*, 141 F.4th 1201, 1211 (11th Cir. 2025) (citing *Richmond v. Badia*, 47 F.4th 1172, 1179 (11th Cir. 2022) holding that video evidence must be accepted over the nonmoving party's account "when the former obviously contradicts the latter."). Further, when a videotape captures the events in question such that no reasonable jury could believe a plaintiff's version of events, a court should not adopt the plaintiff's version of the facts for purposes of ruling on a summary judgment motion. *Scott v. Harris*, 550 U.S. 372 (2007).

**II. Plaintiff was not detained against his will to establish false imprisonment, and NCL's security personnel, at worst, performed a legal arrest.**

Under Florida law, false imprisonment is the unlawful restraint of a person against his will. *Archer v. City of Winter Haven*, 846 Fed. Appx 759, 763 (11th Cir. 2021) (citing *Johnson v. Weiner*, 19 So. 2d 699, 700 (Fla. 1944)). To be liable for false imprisonment, the plaintiff must establish (1) the unlawful detention and deprivation of liberty of a person, (2) against that person's will, (3) without legal authority or 'color of authority' … (4) which is unreasonable and unwarranted under the circumstances. *Archer*, 846 Fed. Appx at 763 (citing *Harder v. Edwards*, 174 So. 3d 524, 530 (Fla. 4th DCA 2015) quoting *Montejo v. Martin Mem'l Med. Ctr., Inc.*, 935 So. 2d 1266, 1268 (Fla. 4th DCA 2006).

Pursuant to element (1) of false imprisonment, above, a plaintiff must show that they were restrained "against [their] will." Beyond being detained, it must have been an "unlawful" detention. *Id.* Therefore, if the detention was lawful, this functionally serves as an affirmative

defense. *Johnson v. Barnes & Noble Booksellers, Inc.*, 437 F.3d 1112, 1116 (11th Cir. 2006). Notably, private individuals have the right to effectuate an arrest for breach of the peace, defined by Section 877.03, Florida Statutes, as occurring when a person commits "such acts as are of a nature to corrupt the public morals, or outrage the sense of public decency, or affect the peace and quiet of persons who may witness them, or **engages in brawling or fighting**[.]" *Id.* (bolded for emphasis). The way this Statute has been interpreted, it is required for there to be a showing that a breach of the peace presents an imminent threat to public security or morals to justify a citizen taking immediate action. *Id.* citing *State v. Furr*, 723 So. 2d 842, 844 (Fla. 1st DCA 1998). Lastly, the private person making the arrest must have been in the presence of the breach and have seen it themselves. *Id.* citing *Steiner v. State*, 690 So. 2d 706, 708 (Fla. 4th DCA 1997).

In this case, after being struck by Mr. Krimmel, Plaintiff walked into the center of the Prima Lounge, turning his hat backwards, stopping, and facing Mr. Krimmel while appearing to taunt him. [*See* **Exhibit "A,"** Camera 6019, from 12:58:27am to 12:58:40am]. Plaintiff states in his deposition that he never struck or attempted to strike Mr. Krimmel. [*See* **Exhibit "J"** at 97:17-22]. However, CCTV footage clearly depicts Plaintiff striking, or at the very least, attempting to strike Mr. Krimmel's head while he was on the ground from another strike delivered by Plaintiff. [*See* **Exhibit "C"** from 12:59:25am to 12:59:28am]. In cases where testimony is contradicted by clear video evidence, the testimony should be disregarded, as should be done here. Further, the security personnel that ultimately escorted Plaintiff out of the Prima Lounge witnessed Plaintiff's strike/attempted strike on the grounded Mr. Krimmel. [*See* **Exhibit "B"** from 12:59:28am to 12:59:43am]. Therefore, while Plaintiff maintains that he did not engage in fighting Mr. Krimmel, the CCTV footage shows that Plaintiff was sufficiently engaged in fighting, and thus, a breach of the peace under Fla. Stat. § 877.03 occurred and was witnessed by security staff. As Plaintiff was

engaged in fighting constituting a breach of the peace, a legal arrest was warranted by any private individuals witnessing the fight. *Johnson*, 437 F.3d at 1116. With both parties engaged in fighting in a space with others present, immediate action from the security personnel was necessary with an imminent threat to public security (the safety of themselves, Plaintiff, Mr. Krimmel, and other passengers) if they did not separate Plaintiff and Mr. Krimmel as they did.

Even though Plaintiff was separated from Mr. Krimmel, he was never involuntarily restrained or detained as required to prove false imprisonment. At 1:00am (noted as 12:00am on the CCTV timestamp due to change in time zones) on January 24, 2024, Plaintiff was brought out of the Prima Lounge, upstairs to the Starbucks to separate him from Mr. Krimmel, also exiting the Prima Lounge [*See* **Exhibits "D,"** Camera 6027, **"F,"** Camera 6037, **"F,"** Camera 6039, and **"G,"** Camera 7038 from 12:59:43am to 1:01:45am] Plaintiff testified that the security guards were "pushing" him forward until he stopped walking and demanded they stop touching him, but the CCTV Footage shows they only touched him on the back once when he stopped and faced backwards toward the Prima Lounge. [*See* **Exhibit "J"** at 107:6-17; and **Exhibits "D" – "G"** from 12:59:43am to 1:01:45am]. Plaintiff not only voluntarily walked with security to Starbucks, but he was not restrained at all; Plaintiff was able to walk around, spoke freely with the security personnel, and his friend Mr. Turner arrived with his girlfriend to also speak with Plaintiff and the security personnel. [*See* **Exhibit "G"** from 1:01:45am to 1:06:06am].

Plaintiff entered the security office with head of security, Mr. Horrigan, and two other members of security. [*See* **Exhibit "H,"** Camera 4089, at 1:08:42am]. Plaintiff testified that he was asked to enter one of two cells present in the security office, and Mr. Horrigan tried to get him to spend the night in the ship's jail. [*See* **Exhibit "J"** from 113:6 to 114:10]. Plaintiff further testified that he was eventually told to sit next to Mr. Horrigan's desk, but he refused as he did not

"feel safe sitting down," and he continued to stand for 60 to 90 minutes in the security office. [*Id.* from 114:12 to 115:3; 116:20 to 118:6; and 123:2-5]. Plaintiff added that around the 60 to 90-minute mark of the three hours, the entire security team was called to intimidate, and they "burst in the security office, like a SWAT team kicking in." [*Id.* at 116:6-7; and 119:17-21]. Notably, Plaintiff did not feel intimidated by the presence of the security personnel. [*Id.* at 116:8-9].

Plaintiff's account is very different from the actual events recorded by CCTV footage. Plaintiff was brought into the security office with Mr. Horrigan pulling out a chair at his desk for him to sit at. [*See* **Exhibit "H"** from 1:08:40am to 1:08:48am]. Plaintiff sat down, conversing with Mr. Horrigan as the other two guards stood nearby with one joining in and taking notes. [*Id.* from 1:09:02am to 1:14:15am]. Plaintiff then stands multiple times, explaining and pantomiming how he recalls the altercation occurring. [*Id.* from 1:14:15am to 1:17:15am]. Plaintiff points to his hand, likely asking for ice as testified to in his deposition, and Mr. Horrigan leaves the room. [*Id.* from 1:17:30am to 1:23:25am; and **Exhibit "J"** at 116:13-19]. Despite claiming he stood for 60-90 minutes in the security office, feeling too unsafe to sit, Plaintiff then lounged back with both feet up on another chair while using his cell phone. [*Id.* from 117:23 to 118:6; and **Exhibit "H"** at 1:23:21am]. Shortly thereafter (15 minutes after entering the security office), Plaintiff left the security office to go to the restaurant with the security members already present, and with nobody entering in an intimidating fashion like the "SWAT" nature, as described. [*See* **Exhibit "H"** and **Exhibit "I,"** Camera 6064, from 1:23:32am to 1:24:45am].

At the restaurant, Plaintiff sat at a booth with two security members, further discussing and re-enacting the subject altercation, standing multiple times. [*Id.* from 1:24:45am to 1:28:55am]. Notably, this was a public part of the ship, and multiple uninvolved guests can be seen walking by during this interaction. [*Id.*] Also notably, Plaintiff testified that the security member described as

the "de-escalating officer," "**offered** to take [him] out of the [security office]," to which Plaintiff agreed. [*See* **Exhibit "J"** at 124:3-9 (bolded for emphasis)]. With this offer and acceptance to move out of the room with the "de-escalating officer," Plaintiff consented to going to the restaurant, and thus, there is no restraint against Plaintiff's will required for false imprisonment.

Plaintiff testified that he was withheld medical attention, including ice, until he signed a form. [*Id.* from 127:11 to 128:7]. However, the CCTV footage shows a medical team member arriving at the restaurant to check on Plaintiff and an ice pack being delivered to him by restaurant staff before any form was signed. [*See* **Exhibit "I"** from 1:29:44am to 1:30:27am]. Plaintiff got up to use the wall-attached telephone, and he walked willfully back to the booth he was sitting at. [*Id.* from 1:31:41am to 1:34:30am]. Plaintiff then completed a form, which was likely his own statement that he dictated to Mr. Malayil. [*Id.* from 1:35:02:am to 1:41:14am]. Plaintiff was provided a glass of water while speaking with security. [*Id.* from 1:41:58am to 1:45:05am]. Plaintiff continued to sit, using his cell phone, and talking with security personnel. [*Id.* from 1:45:48am to 1:57:42am.] Security staff dictated Plaintiff's account for a statement, which he signed. [*Id.* from 1:58:25am to 2:40:12am; and **Exhibit "J"** from 124:3 to 125:21] Plaintiff told security that he was tired and was going to his room; notably, they allowed him to leave. [*Id.* from 126:20 to 127:4]. Thus, Plaintiff was never restrained or detained with his liberties deprived.

Overall, Plaintiff willfully walked with security to the security office, agreed to go with the "de-escalating officer" to the restaurant, and was allowed to leave to his cabin on his first attempt. Throughout this process, Plaintiff recalls never feeling intimidated, and he was allowed to stand and walk around freely, voluntarily choosing to extensively discuss the altercation with security. Because Plaintiff was never unwillingly restrained or deprived of any liberty, his claims of false imprisonment fail, and summary judgment for the Defendant is warranted.

### III. Intentional Infliction of Emotional Distress (IIED)

Under Florida law, IIED requires a plaintiff to prove (1) deliberate or reckless infliction of mental suffering, (2) outrageous conduct, (3) that the conduct caused emotional distress, and (4) that the distress was severe. *Parkey v. Carter*, 702 F.Supp.3d 1252, 1258 (S.D. Fla. 2023) (citing *Nettles v. City of Leesburg Police Dep't*, 415 F.Appx. 116 (11th Cir. 2010) (quoting *Hart v. United States*, 894 F.2d 1539, 1548 (11th Cir. 1990)). Because Plaintiff has not demonstrated conduct on behalf of Defendant that rises to the level of "outrageous", nor has he demonstrated suffering from "severe emotional distress" due to Defendant's conduct, his claims of IIED are insufficient.

### a. No "outrageous conduct" was demonstrated.

Courts only uphold claims of IIED in "extremely rare circumstances." *Triana v. Diaz*, 2014 WL 5319800 at *7 (S.D. Fla. 2014). Outrageous conduct is that which is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Metro. Life Ins. Co. v. McCarson*, 467 So. 2d 277, 278-79 (Fla. 1985). Florida District Courts of Appeal have held that liability for IIED "does not extend to mere insults, indignities, threats, or false accusations", and "'vicious verbal attacks' that included the use of humiliating language and racial epithets did not reach the level of outrageousness required for an IIED claim." *Lopez v. Target Corp.*, 676 F.3d 1230, 1236 (11th Cir. 2012) (citing *Williams v. Worldwide Flight SVCS. Inc.*, 877 So. 2d 869 (Fla. 3d DCA 2004) and *Lay v. Roux Labs., Inc.*, 379 So. 2d 451, 452 (Fla. 1st DCA 1980)).

Florida's burden of "outrageous" conduct is exceptionally high, demonstrated by *Williams*, where an African American employee was called the "n"-word and "monkey" in front of him and over the employer's walkie-talkie system, had false disciplinary records made against him, was forced to load/unload aircrafts in inclement and dangerous weather conditions, had his break times

removed, and was disallowed from working with other African Americans because "'n'-words will steal if they are left to work together." *Williams*, 877 So. 2d at 870. While these actions are clearly reprehensible, objectionable, and offensive, Florida courts still find this insufficient to recover under the theory of IIED. *Id.* The plaintiff in *Williams*, the plaintiff was further falsely accused of theft, but this was insufficient to support his claim of IIED. *Id.* Likewise, failure to provide medical assistance is not enough to establish IIED. *Corbin v. Prummell*, 655 F.Supp.3d 1143, 1166 (M.D. Fla. 2023). In *Corbin*, even though a deputy kicked the plaintiff, breaking her leg, and handcuffed the plaintiff, calling for more law enforcement rather than emergency medical assistance, this conduct is not outrageous enough to sustain an IIED claim. *Id.*

In this case, Plaintiff alleges in his deposition that the head of Defendant's security staff used a derogatory term referring to Plaintiff as "boy." [*See* **Exhibit "J"** at 195:4-8]. Plaintiff also noted that the same member of security made a comment about "you people" and "y'all." [*Id.* at 134:5-20]. Plaintiff testified that he did not believe the comments other than "you people" were racist but simply were "derogatory." [*Id.* at 134:5-9]. Plaintiff added that he also was denied receiving ice and an X-ray for his arm for the time that he was with security, totaling 60-90 minutes. [*Id.* at 127:5-19]. However, Plaintiff was only in the security office for about 15 minutes, was given an ice pack by NCL's staff, and was seen by a medical staff member. [*See* **Exhibit "I"** from 1:29:44am to 1:30:27am]. Plaintiff claimed that later in the cruise, the head of security told Plaintiff's sister that Plaintiff will be arrested once he gets home for sexual assault, i.e. for allegedly touching Mr. Krimmel's girlfriend. [*See* **Exhibit "J"** at 191:1-6].

Even if the alleged comments were made and despite their offensive nature, Florida's burden of "outrageous" is so exceptionally high that these do not substantiate a claim of IIED. If the comments made by co-workers of the plaintiff in *Williams* did not suffice to maintain a claim

of IIED, nor did false accusations of theft, then neither should the alleged comments made by Mr. Horrigan or any other crewmember. 877 So. 2d at 870. Similarly, Plaintiff being denied in his request for an X-ray, yet being given an ice pack and medical attention is certainly no more severe than *Corbin* where the plaintiff was initially denied medical treatment after the responding police officer kicked her and broke her leg. 655 F.Supp.3d at 1166. Therefore, Plaintiff's claim of IIED should fail because the high burden of "outrageous" conduct was not met by Defendant's conduct.

### b. Plaintiff did not experience "severe emotional distress."

The Florida standard of "severe emotional distress", elements (3) and (4) of IIED, is less developed than the standard of "outrageous" conduct. *Kim v. Jung Hyun Chang*, 249 So. 3d 1300, 1305 (Fla. 2d DCA 2018). The definition mainly used for severe emotional distress is "emotional distress of such a substantial quality or enduring quality that no reasonable person in a civilized society should be expected to endure it." *Id.* (citing *Kraeer Funeral Homes, Inc. v. Noble*, 521 So. 2d 324, 325 (Fla. 4th DCA 1988). Intensity and duration are factors to be considered in determining severity. *Id.* (citing Restatement (Second) of Torts § 46 cmt. J (Am. Law Inst. 1965)). However, the *Kim* court also recognized that significant feelings of fright, shame, worry, and humiliation (including other emotions) caused by others are part of living in society, even if they are caused by regrettable actions. *Id.* at 1306.

Plaintiff noted that following the Prima Lounge incident, there were more security guards following him around the ship, and he felt it was with the intent to intimidate him. [*Id.* at 132:12-21]. While feelings of intimidation and fear can be considered regrettable within society, they are certainly emotions that are part of living in society, like fright and worry. *Kim*, 249 So. 3d at 1305. Further, in terms of the factors of intensity and duration of emotional distress, neither here can be described as "of such substantial quality or enduring quality that no reasonable person in civilized

society should be expected to endure it." *Id.* Plaintiff's own words of "fearful **a bit**", and "**a little bit** scared" undermine the intensity of any emotional distress he was experiencing. [*See* **Exhibit "J"** at 115:22-25; and 116:1-11 (bolded for emphasis)]. Therefore, even if the conduct of the Defendant's security staff was deemed "outrageous", Plaintiff did not experience severe emotional distress to recover under a claim of IIED.

### IV. There is no evidence that NCL was negligent.

General principles of negligence law apply to maritime tort cases. *Masse v. MSC Cruises, S.A.*, 808 F.Supp.3d 1312, 1319 (S.D. Fla. 2025) (citing *Guevara v. NCL (Bahamas) Ltd.*, 920 F.3d 710, 723 (11th Cir. 2019). Therefore, to prevail on a maritime negligence claim, a plaintiff must show that (1) the defendant had a duty to protect the plaintiff from a particular injury; (2) the defendant breached that duty; (3) the breach actually and proximately caused the plaintiff's injury; and (4) the plaintiff suffered actual harm. *Masse*, 808 F.Supp.3d at 1319 (citing *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1336 (11th Cir. 2012)). In cases where an alleged "menace that is not unique to the sea," is involved, a cruise ship operator's liability hinges on whether it should have known of a dangerous condition. *Masse*, 808 F.Supp.3d at 1319 (citing *Keefe v. Bahama Cruise Line, Inc.*, 867 F.2d 1318, 1320-21 (11th Cir. 1989)). Overall, the facts must show that a reasonable defendant would be put on notice of the impending danger to the plaintiff. *Masse*, 808 F.Supp.3d at 1319-20 (citing *Doe v. Royal Caribbean Cruises, Ltd.*, 2011 WL 6727959 at *4 (S.D. Fla. Dec. 21, 2011)).

In this case, Plaintiff asserts negligence through four counts of his Amended Complaint. [*See* Plaintiff's Amended Complaint [ECF No. 8] at Counts III – VI]. Plaintiff alleges that NCL was negligent through vicariously overserving alcohol to Mr. Krimmel, vicariously failing to

prevent assault, directly failing to safely maintain the premises, and directly negligently training its security. Because all negligence allegations fail, summary judgment should be granted for NCL.

### a. NCL did not negligently fail to prevent the assault from Mr. Krimmel and, thus, Defendant is entitled to summary judgment as to Count III.

NCL's security staff in this case owed a duty to Plaintiff to reasonably protect him from known dangers. If NCL was not put on notice of any dangers, then they are likewise not liable for the harm caused. Mr. Krimmel, prior to the subject altercation, was not a known danger, and there was no notice that he presented any danger whatsoever. Plaintiff's own observations of Mr. Krimmel, mere minutes before the verbal altercation began, was that Mr. Krimmel was friendly, offering a hug and fist bump to Plaintiff. [*See* **Exhibit "J"** at 68:11-17; and **Exhibit "A"** from 12:49:35am to 12:49:48am]. Plaintiff's security expert Lori Nelson testified that up until the time Plaintiff stood up, there was no situation in which security should have intervened, and this is the exact moment the security officers began to go toward the pair. [*See* **Exhibit "K"** at 181:5-19; and **Exhibit "A"** at 12:57:25am]. During the subject altercation, Mr. Krimmel was restrained multiple times, but Plaintiff stayed within the Prima Lounge and gave a visible target to Mr. Krimmel. [*Id.* from 12:58:27am to 12:58:40am; and **Exhibit "B"** from 12:59:04am to 12:59:21am and 12:59:28am to 12:59:43am]. Overall, NCL's staff intervened while the altercation was still verbal, and they began physically separating the men even before Mr. Krimmel struck Plaintiff for the first time. NCL staff did everything they could to restrain Mr. Krimmel, but due to his state of being enraged and his large size, Mr. Krimmel broke free without negligence of NCL.

Although Plaintiff's expert Lori Nelson testified that NCL security could have done more to restrain Mr. Forsythe during the subject altercation, the CCTV demonstrates that this was not possible and Ms. Nelson's opinions are effectively without sufficient basis as outlined in Defendant's pending Daubert Motion. In the event that this Court denies the Defendant's Daubert

**COLE, SCOTT & KISSANE, P.A.**
ESPERANTE BUILDING - 222 LAKEVIEW AVENUE, SUITE 500 - WEST PALM BEACH, FLORIDA 33401 (561) 383-9200 - (561) 683-8977 FAX

Motion on this basis, then the Defendant acknowledges that summary judgment as to Count III should be denied. Regardless, summary judgment should be granted for the Defendant, as NCL did not negligently fail to prevent the subject assault.

   **b.   There is no evidence that NCL overserved alcohol to Mr. Krimmel while he was obviously intoxicated or otherwise acting inappropriately and, thus, Defendant is entitled to summary judgment as to Count IV.**

An action for over-service of alcohol sounds in negligence. *D.S. v. Carnival Corp.*, 2026 WL 880710 at *3 (S.D. Fla. Feb. 17, 2026) (citing *Doe v. NCL (Bahamas) Ltd.*, 2012 WL 5512347 (S.D. Fla. Nov. 14, 2012). Liability for over-service of alcohol does not attach strictly from how much alcohol was served to a person; rather, liability attaches based on serving alcohol to "an obviously intoxicated person who is intoxicated to the extent that the person is a danger to himself, herself, or others." *Masse*, 808 F.Supp.3d at 1330. If there is no evidence that a plaintiff is served alcohol after their dangerous condition becomes apparent, "the quantity of alcohol served at any particular time is only, at most, tangentially relevant. *Id.*

In this case, Plaintiff has presented no evidence that Mr. Krimmel was provided alcohol by NCL while he appeared intoxicated, let alone to the extent that he presented a danger to himself or others. NCL is not disputing that Mr. Krimmel was served alcohol, but the quantity and timing of alcohol served is, at most, tangentially relevant when there is no evidence that Mr. Krimmel was served alcohol after his dangerous condition became known. Ms. Nelson testified that Mr. Krimmel was served alcohol for an extended period, and they should have known he was intoxicated. [*See* **Exhibit "K,"** Deposition of Lori Nelson at 176:16-22]. However, quantity of alcohol served and consumed is only tangentially relevant if Mr. Krimmel did not present an obvious danger to himself or others. To that end, Mr. Krimmel was seen appearing friendly to all he encountered, including the Plaintiff, until the subject altercation began. [*See* **Exhibit "B"** from

12:06:55am to 12:48:25am]. Plaintiff's own observations, just before the subject altercation, were that he was friendly and greeted him with a fist bump and hug. [*See* **Exhibit "J"** at 68:11-17 and **Exhibit "A"** at 12:49:35am to 12:49:48am]. As no dangerous condition was present until the subject altercation, Plaintiff cannot demonstrate that any bartender serving Mr. Krimmel could have seen that he was a danger to himself or others. Therefore, NCL did not negligently over-serve alcohol to Mr. Krimmel.

Likewise, Plaintiff has provided no causal link between alcohol consumption by Mr. Krimmel and the cause of the subject altercation. Plaintiff testified that Mr. Krimmel accused him of talking to his girlfriend before initiating the fight. [*See* **Exhibit "J"** at 76:10-14]. Additionally, Mr. Gurung testified that Mr. Krimmel was shouting about Plaintiff touching his girlfriend. [*See* **Exhibit "L"** at 43:10 to 44:5]. A person who is not even under the influence of alcohol may react with anger and/or violence when there has been an allegation that a third party inappropriately touched that person's romantic partner. As such, Plaintiff has not presented any evidence that Mr. Krimmel's drinking alcohol caused the subject altercation. Further, Ms. Lori Nelson admitted that she did not watch any video footage of Mr. Krimmel from 6:00pm until around midnight despite NCL providing this video to Plaintiff. [*See* **Exhibit "K"** at 100:14-22; and 175:22-23]. With this six-hour gap, there is an even further causal gap between Mr. Krimmel's state and the subject altercation.

Overall, NCL never served alcohol to Mr. Krimmel while he was in an obvious state of being intoxicated to the point of presenting a danger to himself or others. Likewise, Plaintiff has failed to establish a causal link between alcohol consumption by Mr. Krimmel and the subject altercation. Therefore, summary judgment as to Count IV of Plaintiff's Amended Complaint [ECF No. 8] should be granted for Defendant.

**COLE, SCOTT & KISSANE, P.A.**
ESPERANTE BUILDING - 222 LAKEVIEW AVENUE, SUITE 500 - WEST PALM BEACH, FLORIDA 33401 (561) 383-9200 - (561) 683-8977 FAX

### c. NCL did not negligently fail to safely maintain the premises and, thus, Defendant is entitled to summary judgment as to Count V.

Plaintiff alleges that NCL failed to safely maintain the premises by failing to take steps ensuring adequate security was present, over-serving alcohol to intoxicated passengers, and failing to control passengers that were clearly and visibly intoxicated. [*See* Plaintiff's Amended Complaint [ECF No. 8] at ¶ 89]. With alleged over-service of alcohol addressed above, Plaintiff has also failed to provide evidence NCL has failed to ensure adequate security was present. Ms. Nelson testified that despite two security guards being deployed, there should have been more present. [*See* **Exhibit "K"** at 199:2-6]. However, Ms. Nelson also testified that the two security guards provided enough security to reasonably allow Plaintiff to feel safe walking to the center of the room and looking back at Mr. Krimmel being subdued; further, she stated she would feel safe herself. [*Id.* from 149:9 to 150:15]. Two additional security guards entered the Prima Lounge within approximately 30 to 40 seconds of Mr. Krimmel first striking Plaintiff, which further demonstrates that the Prima Lounge was adequately provided security. [*See* **Exhibit "B"** at 12:58:55am]. Ultimately, Plaintiff has provided no evidence that NCL failed to safely maintain the premises, as there were adequate security personnel present in, or near the Prima Lounge to respond. It is also speculative that additional security would have prevented the subject altercation.

Although Plaintiff's expert Lori Nelson testified that NCL security failed to recognize pre-escalation behavior by Mr. Krimmel, she also acknowledged that the subject altercation was not foreseeable and that Mr. Krimmel was not causing problems for anyone prior to the subject altercation. [*See* **Exhibit "K"** at 130:10-18; and 181:2-10]. As such, Ms. Nelson's opinions are effectively without sufficient basis as outlined in Defendant's pending Daubert Motion. In the event that this Court denies the Defendant's Daubert Motion on this basis, then the Defendant acknowledges that summary judgment as to Count V should be denied. Regardless, summary

COLE, SCOTT & KISSANE, P.A.
ESPERANTE BUILDING - 222 LAKEVIEW AVENUE, SUITE 500 - WEST PALM BEACH, FLORIDA 33401 (561) 383-9200 - (561) 683-8977 FAX

judgment should be granted for the Defendant, as NCL did not negligently fail to safely maintain the premises.

### d. NCL did not negligently train its security staff and, thus, Defendant is entitled to summary judgment as to Count VI.

Plaintiff's only evidence of lack of adequate training for its security staff is Ms. Nelson's investigation into the responding security personnel's employment files. [*See* **Exhibit "K"** at 219:3-9]. Ms. Nelson notes that the staff lacks "handcuff training." [*Id.* at 221:19-24]. Ms. Nelson ultimately could only cite to lack of "constant training" and having no law enforcement background to being the reasons security staff lacked qualifications for their roles. [*Id.* at 222:1-6; and 224:4-8]. However, one of the responding security guards, Amrit Gurung, testified that prior to his hiring he needed one month in security training. [*See* **Exhibit "L,"** Deposition of Amrit Gurung from 9:24 to 10:5]. After hiring, Mr. Gurung was further trained in watchkeeping, crowd control, and safety and security of the vessel before beginning work. [*Id.* at 11:6-16]. Notably, they "always" do on-the-job training for daily duties. [*Id.* at 12:21-25]. Additionally, Mr. Gurung notes security personnel receive handcuff training through online videos and practical training, and there is a yearly training field officer present. [*Id.* at 17:5-18]. Overall, Plaintiff has provided no evidence to counter any of the testimony of Mr. Gurung. Ms. Nelson's testimony that NCL staff does not receive handcuff training has no basis, and she had no citations to any claims NCL fails to adequately train its security staff. In her deposition, Ms. Nelson testified that she would supplement her report as to violations of the CVSSA and failure to comply with the STCW; however, no supplements have been received to date. [*See* **Exhibit "K"** at 239:6-16]. For these reasons, summary judgment must be granted for the Defendant as it relates to claims of negligently training its security staff.

Although Plaintiff's expert Lori Nelson testified that NCL security was negligently trained to respond to the subject altercation, she has only noted deficits in backup training for Mr. Malayil, and lack of handcuff training for Ms. Gurung. [*Id.* at 219:8-15]. Plaintiff has made no attempt to depose Ms. Gurung, and Mr. Gurung testified they do receive this training. [*See* **Exhibit "L"** at 17:5-18]. In the event that this Court denies the Defendant's Daubert Motion on this basis, then the Defendant acknowledges that summary judgment as to Count VI should be denied. Regardless, summary judgment should be granted for the Defendant, as NCL did not negligently train its security staff.

## V. Conclusion

The available evidence shows that Plaintiff's claims are insufficient, and summary judgment must be granted in favor of the Defendant. As for false imprisonment, the first time that NCL's security personnel went to approach and remove Plaintiff from the scene of the subject altercation was after he struck or attempted to strike Mr. Krimmel while Mr. Krimmel was on the ground. This conduct constituted a breach of the peace, as Plaintiff was engaged in fighting and put the safety of Mr. Krimmel and others at risk. Immediate action must have been taken by NCL's security personnel, and they simply separated him from Mr. Krimmel. Any "arrest" made would have been legal given the security staff's witnessing the breach of the peace. Further, Plaintiff was not held longer than necessary given the circumstances. He was brought to the security office for a period of around 15 minutes, and then he agreed to go to a restaurant with the "de-escalating officer." While he spent over an hour in the restaurant, he was not detained and he voluntarily remained for an extended period to discuss the altercation with security personnel. He was given an ice pack and was seen by a medical staff member. When he announced he was tired and would

be leaving to go to his cabin, he was allowed to do so without any issues. Thus, Plaintiff's claim of false imprisonment is insufficient.

Plaintiff's claim of IIED also fails, as the elements of "outrageous conduct" and "severe emotional distress" have not been met. Florida's standard of "outrageous conduct" is an extremely high burden to which threats, false accusations, and even racial epithets are insufficient in reaching. Case law has demonstrated that racist words, phrases, and behaviors, public humiliation, and even denial of medical treatment where harm is brought by the one denying the treatment are not enough to meet the requirements of "outrageous conduct." Plaintiff was allegedly spoken to with "derogatory" language, and he was allegedly refused an X-ray in the time immediately following the subject altercation. Despite these allegations being regrettable if accurate, they still do not rise to the level of "outrageous conduct" for which a plaintiff can recover for IIED. Similarly, Plaintiff did not experience "severe emotional distress" to the point where he must have experienced distress of "such a substantial quality or enduring quality that no reasonable person in a civilized society should be expected to endure…." Plaintiff's experience of being "a little bit scared" and "fearful a bit" from seeing more security guards around him after the physical altercation is not of such a nature that our society cannot tolerate someone experiencing it. These are emotions that are part of living in society, even if not pleasant. Thus, Plaintiff's claim of IIED is insufficient.

Lastly, Plaintiff's claims arising from NCL's alleged negligence fail as well. There is no evidence that Mr. Krimmel appeared to be obviously intoxicated to any staff member serving him an alcoholic drink. Likewise, Mr. Krimmel never appeared to be a threat to himself or others until the time of the subject altercation, and Plaintiff has failed to causally link alcohol consumption to Mr. Krimmel's actions. Thus, NCL cannot be held liable for overserving Mr. Krimmel alcohol, let alone this allegation causing the subject altercation.

NCL also cannot be held liable for failing to prevent the subject altercation or failing to keep the premises safe. NCL had two security guards within the Prima Lounge prior to the fight breaking out, and they approached Plaintiff and Mr. Krimmel while the dispute was still verbal, attempting to separate the pair. While Mr. Krimmel ultimately escaped from security staff multiple times, Plaintiff has presented no evidence that this was a breach of the standard of care NCL owed him. Ms. Nelson stated that Plaintiff could reasonably feel safe with two guards on Mr. Krimmel, so there was certainly adequate security present. Finally, Plaintiff has failed to prove negligent training from NCL. Mr. Gurung testified that security personnel receive training in handcuff applications, crowd control, watchkeeping, and safety. Therefore, all of Plaintiff's negligence claims against NCL should fail, and summary judgment must be granted for Defendant.

WHEREFORE, NCL (Bahamas) Ltd., respectfully requests that this Court grant its Motion for Summary Judgment and grant any other relief this Court deems just and proper.

**COLE, SCOTT & KISSANE, P.A.**
ESPERANTE BUILDING - 222 LAKEVIEW AVENUE, SUITE 500 - WEST PALM BEACH, FLORIDA 33401 (561) 383-9200 - (561) 683-8977 FAX

CASE NO.: 1:25-cv-20281-EA

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 20th day of April 2026, a true and correct copy of the

foregoing has been furnished by electronic filing with the Clerk of the court via CM/ECF, which

will send notice of electronic filing to all counsel of record.

COLE, SCOTT & KISSANE, P.A.
*Counsel for Defendant NCL (Bahamas) Ltd.*
Esperante Building
222 Lakeview Avenue, Suite 500
West Palm Beach, Florida 33401
Telephone (561) 383-9242
Facsimile (561) 683-8977
Primary e-mail: david.kirsch@csklegal.com
Secondary e-mail: jaclyn.lassner@csklegal.com

By:   */s/ Jaclyn N. Lassner*

DAVID A. KIRSCH
Florida Bar No.:  86038
JACLYN N. LASSNER
Florida Bar No.:  117977